**JEFFERY KENNETH PERKINS (CSBN 57996)**
**LAW OFFICE OF JJEFFERY KENNETH PERKINS**
1550-G Tiburon Blvd, Suite 344
Tiburon, CA 94920
Telephone: (415) 302-1115
Facsimile: (415) 435-4053

**JOSEPH M. ALIOTO (CSBN 42680)**
**JAMIE MILLER (CSBN 271452)**
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, California 94104
Telephone: 415.434.0900
Facsimile: 415.434.8200

Attorney for Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| EDWARD LAWRENCE, MICHAEL MARTIN,<br><br>Plaintiffs,<br>vs.<br><br>UNITED AIRLINES, INC.; AMERICAN AIRLINES, INC.; DELTA AIRLINES, INC.; and SOUTHWEST AIRLINES, CO.,<br><br>Defendants. | **CASE NO.**<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs, Audrey Ondrade, Jacob Dombroski and Marisa Dombroski, demanding trial by jury, complains and alleges as follows:

**I. NATURE OF THE ACTION.**

1. This action arises out of a conspiracy by the four largest commercial airlines in the United States – United Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., and Southwest Airlines Co.

(collectively "Defendants") – which began no later than July 2, 2011, and continues to the present (the "Class Period"), to fix, raise, maintain, and/or stabilize prices for air passenger transportation services within the United States in violation of Section 1 and Section 3 of the Sherman Antitrust Act, 15 U.S.C. § 1 and 15 U.S.C. § 3, by, among other things, colluding to limit seat capacity.

**II. JURISDICTION AND VENUE.**

2. This complaint is filed under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, to obtain equitable relief, including costs of suit and reasonable attorneys' fees, for violations of Section 1 and Section 3 of the Sherman Act, 15 U.S.C. § 1, 15 U.S.C. § 3. The Court has original federal-question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

3. Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found and/or have agents within this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

4. This Court has personal jurisdiction over Defendants because, *inter alia*, each: (a) transacted business in this District; (b) directly sold and delivered passenger air transportation in this District; (c) has substantial aggregate contacts within this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**III. INTRADISTRICT ASSIGNMENT.**

5. Intradistrict assignment in the San Francisco Division is appropriate. The practices at issue affect adversely air passengers who reside in that division and paid airfares, baggage fees and cancellation fees to Defendants. Antitrust class actions involving claims of fare and/or fuel surcharge price-fixing by airlines have previously been filed in the San Francisco Division and were or are being presided over by The Honorable Charles R. Breyer. See, *In re Transpacific Passenger Air*

*Transportation Antitrust Litig.*, MDL No. 1913, No. 07-cv-5634-CRB (N.D. Cal.); *In re International Air Transportation Surcharge Antitrust Litig.*, MDL No. 1793, No. M-06-1793 CRB (N.D. Cal.).

**IV. PLAINTIFFS.**

6. Plaintiffs, EDWARD LAWRENCE and MICHAEL MARTIN are residents of San Tiburon, California. During the Class Period, Plaintiffs purchased air passenger transportation services directly from one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violation alleged herein

**V. DEFENDANTS.**

7. United Airlines, Inc. ("UA"), a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 233 South Wacker Drive, Chicago, Illinois, 60606, is hereby named a defendant herein. UA conducts air passenger transportation services throughout the United States, including within this District.

8. American Airlines, Inc. ("American"), a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 4333 Amon Carter Boulevard, Fort Worth, Texas, 76155, is hereby named a defendant herein. American conducts air passenger transportation services throughout the United States, including within this District.

9. Delta Air Lines, Inc. ("Delta"), a corporation organized and existing under the laws of the State of Delaware, with its principal; place of business located at 1030 Delta Boulevard, Atlanta, Georgia, 30354, is hereby named a defendant herein. Delta conducts air passenger transportation services throughout the United States, including within this District.

10. Southwest Airlines Co. ("Southwest"), a corporation organized and existing under the laws of the State of Texas, with its principal place of business located at 2702 Love Field Drive, Dallas, Texas, 75235, is hereby named a defendant herein. Southwest conducts air passenger transportation services throughout the United States, including within this District.

**VI. UNNAMED CO-CONSPIRATORS.**

11. Various persons, firms, corporations, partnerships, and other entities, currently unknown to Plaintiffs, participated with Defendants in the unlawful restraints of trade alleged herein. When the

identities of these currently-unknown co-conspirators become known, Plaintiffs will amend this complaint to add them as Defendants. All averments herein against Defendants are also averred against these unnamed co-conspirators.

**VII. AGENTS**

12. The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

**VIII. NATURE OF INTERSTATE TRADE ANC COMMERCE.**

13. Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the provision of air passenger transportation services transmitted in interstate commerce between and among offices of Defendants and their customers located throughout the United States.

14. During the Class Period, Defendants transported substantial numbers of passengers, in a continuous and uninterrupted flow of interstate commerce, between various airports in the United States.

15. Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably-foreseeable effect upon commerce in the United States.

**IX. FACTUAL ALLEGATIONS.**

16. Defendants are the four largest providers of air passenger transportation services in the United States. Each Defendant provides air passenger transportation services on routes between hundreds of cities within the United States.

17. The domestic airline passenger industry is an oligopoly. Due to a series of mergers, particularly since 2008, UA, American, Delta, and Southwest now control approximately 80% of the domestic air passenger seats. During that period, they have taken steps to limit capacity growth in order to keep airfares artificially high. The average domestic airfare rose 13 percent from 2009 to 2014, according to data from the federal Department of Transportation's Bureau of Transportation Statistics. The four Defendant airlines also began collecting new ancillary fees, such as $25 each way to check a

bag and $200 to change a reservation. As a result, the industry has earned record profits. In the past two years, United States airlines earned a combined $19.7 Billion in revenue. The International Air Transport Association ("IATA") is predicting net after-tax profits for North American airlines of $13.2 billion, which exceeds the peak reach in the 1990's.

18. One reason why the year 2015 may be especially profitable for the airlines is because of significant decreases in the costs of jet fuel. It has been estimated that in April of 2015, United States airlines paid $1.94 per gallon for jet fuel, a decrease of 34% from the previous year. One would expect that in a competitive industry, airfares would decrease as a result, while airlines sought to obtain great market shares. That has not happened. "The idea that U.S. airlines would, once again, devolve into a war for market share is founded on a misunderstanding of the new structure of U.S. airlines," Vinay Bhaskara, an industry analyst, wrote in *Airways News*. "We are unquestionably living with an air travel oligopoly." He added that "[r]emember, this is the same management group that (instead of allowing passengers to reap a modest reduction in fares) responded to the F.A.A.'s inability to collect taxes in mid-2011 by gleefully raising base fares to where total out-of-pocket costs were exactly the same (earning a windfall of $28.5 million per day)." United States Senator Charles E. Schumer ("Schumer") has echoed this point, stating in December of 2014 that "[a]t a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity …. The industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather."

19. One reason for this is the wave of mergers and consolidations that have affected the domestic air passenger industry in recent years, leaving only four major players in the market.

20. In its complaint dated August 13, 2013 that was filed in *United States v. U.S. Airways Group, Inc.*, No. 1:13-cv-01236 (D.D.C.), in which it challenged the merger of American and U.S. Airways, the United States Depart of Justice's Antitrust Division ("DOJ") noted its concerns about the increasing consolidation and coordinated anticompetitive conduct in the domestic air passenger industry.

21. Specifically, the DOJ noted that "[t]he structure of the industry is already conducive to

coordinated behavior." As one example, the DOJ noted that airlines closely watch each other's fares and match each other's fare increases. As another example, the DOJ pointed to the use of "cross-market initiatives" ("CMIs") to deter fare wars. "A CMI occurs where two or more airlines compete against each other on multiple routes. If an airline offers discounted fares in one market, an affected competitor often responds with discounts in another market – a CMI – where the discounting airline prefers a higher fare. CMIs often cause an airline to withdraw fare discounts."

22. The DOJ also noted past express coordinated behavior by the airlines in the form of the creation of Airline Tariff Publishing Company ("ATPCO"), a "dedicated price-telegraph network for the industry." As DOJ explained, "[t]he airlines use ATPCO to monitor and analyze each other's fares and fare changes and implement strategies designed to coordinate pricing. Airlines have previously used ATPCO to engage in coordinated behavior. In 1992, the United States filed a lawsuit to stop several airlines, including both defendants, from using their ATPCO filings as a signaling device to facilitate agreements on fares. That lawsuit resulting in a consent decree, now expired."

23. The DOJ also noted direct communications among airlines on airfares. It gave the following example:

> US Airways also has communicated directly with a competitor when it was upset by that competitor's efforts to complete more aggressively. In 2010, one of US Airways' larger rivals extended a "triple miles" promotion that set off a market share battle among legacy carriers. The rival airline was also expanding into new markets and was rumored to be returning planes to its fleet that had been mothballed during the recession. US Airways' CEO complained about these aggressive maneuvers, stating to his senior executives that such actions were "hurting [the rival airline's] profitability – and unfortunately everyone else's." US airways' senior management debated over email about how best to get the rival airline's' attention and bring it back in line with the rest of the industry. In that email thread, US Airway' CEO urged the other executives to "portray [] these guys as idiots to Wall Street and anyone else who'll listen." Ultimately, to make sure the message was received, US Airways' CEO forwarded the email chain – and its candid discussion about how aggressive competition would be bad for the industry – directly to the CEO of the rival airline. (The rival's CEO immediately responded that is was an inappropriate communication that he was referring **[sic]** to his general counsel.)

24. The DOJ ultimately settled the case, allowing the merger to occur, conditioned on the divestiture of certain flight slots. The merger has been consummated, resulting in significant further consolidation, and U.SS. Airways it expected to cease formal existence in the summer of 2015.

25. The new order created by these mergers resulted in capacity being reduced while airfares soared. As Jeff Sismek, the CEO of United, has been quoted as saying in a January 2015 article after United announced a $2 billion profit in 2014, "[w]e will absolutely not lose our capacity discipline …. It's very healthy for us and very healthy for the industry." The Defendants' position on capacity has been disseminated by the organization Airlines for America, a trade group to which they all belong and which provides a convenient forum for discussion of both the industry position on capacity and on other topics, such as common bag check fees or reservation cancellation charges.

26. On May 20, 2015 Gary C. Kelly ("Kelly"), the CEO of Southwest, announced a break in this industry front, saying that Southwest planned to increase its capacity by as much as eight percent by acquiring two new gates at its hub at Love Field, Dallas. The industry reaction was instantaneous. The stock prices of the other defendant airlines plummeted. "Understandably, investors are questioning if this signals the end of the era of industry capacity discipline," Raymond James analyst Savanthi Syth wrote in a research note. Similarly, Wolf Research airline analyst Hunter Keay said that "[d]omestic capacity discipline has effectively vanished."

27. The other airlines decided they had to ensure that Southwest did not break rank on the capacity issue. On June 7-9, 2015, the International Air Transport Association ("IATA"), an international trade body representing over 240 domestic and international airlines, held its Annual General Meeting in Miami, Florida. Chief executives of many of the leading passenger airlines were in attendance. During the course of that meeting, several of them spoke publicly about the need for 'discipline" within the industry. Delta's president, Ed Bastian, said that Delta is 'continuing with the discipline that the marketplace is expecting." American's chief executive, Douglas Parker, stated that the airlines had learned their lessons from past price wars: "I think everybody in the industry understands that." Air Canada's chief executive, Calin Rovinescu, echoed these sentiments, saying "People were undisciplined in the past, but they will be more disciplined this time." As one commentator, James B. Stewart, observed in a June 11, 2015 *New York Times* article, "'Discipline' is classic oligopoly-speak for limiting flights and seats, higher prices and fatter profit margins. This year, that discipline seems to be working: IATA projected this week that airline industry profits would more

than double this year to nearly $30 billion, a record.” The same article noted:

> “When airline industry leaders say they’re going to be ‘disciplined,’ they mean they don’t want anyone to expand capacity,” said Fiona Scott Morton, professor of economics at Yale and a former deputy attorney general in the antitrust division of the Justice Department. “And when there aren’t enough seats, airlines raise prices. That’s what we’ve been seeing.

28. These pronouncements by airline executives and the pressure placed on Southwest at the IATA annual General Meeting had the desired effect. The *New York* Times article cited above reported that “after coming under fire at this week’s conference, Southwest quickly moved to reassure investors it isn’t going rogue. ‘We have taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth …’ Kelly said.” It is clear that Southwest knuckled under the collusive ‘discipline” imposed by its competitors.

29. United States Senator Richard Blumenthal (“Blumenthal”) was incensed at these developments. On June 17, 2015, he wrote a letter to United States Assistant Attorney General William Baer. With respect to the withdrawal by Southwest of its plans to increase capacity, Blumenthal stated that “[t]he conclusion seems inescapable that the remarks made at IATA were targeted at Southwest and that its capitulation was the result of the ‘fire’ aimed at the company.”

30. The letter further states:

> Recently, the International Air Transport Association (IATA) brought together the top executives of the worlds’ largest airlines at its annual meeting in Miami, Florida. The *New York Times* reported that at this meeting many of these competitors publicly discussed their strategies to remain “disciplined” in their decisions to manage capacity across their flight routes. As you know from the Department of Justice’s (DOJ’s) investigation into US Airways’ merger with American Airlines in 2013, most airlines have traditionally viewed capacity reductions as a highly valuable way to artificially raise fares and boost profit margins. In light of the recent unprecedented level of consolidation in the airline industry, this public display of strategic coordination is highly troubling.
>
> Therefore, I urge the Justice Department to investigate this apparent anti-competitive conduct potentially reflecting a misuse of market power, and excessive consolidation in the airline industry. DOJ itself played a part in this consolidation by approving several mergers and now consumers are paying sky-high fares as airlines engage in market conduct designed to keep capacity artificially low.

31. Blumenthal's letter concluded:

In August 2013, the Justice Department filed an antitrust lawsuit to block the proposed merger between US Airways and American Airlines. A few months later, DOJ settled that case and allowed the merger to proceed subject to a number of gate divestitures. As a result of that merger, just four major airlines now account for eighty percent of all domestic air travel.

DOJ's original complaint painted a stark picture of an extremely consolidated market, in which a few firms wield enormous market power to the detriment of consumers and competition – and in which high-level executives believe there is an unmistakable link between fluctuations in capacity and fares hikes. During the course of the Antitrust Division's review of the American Airlines / US Airways merger, your staff studied the internal analyses and the planning documents put together by both companies in considering the likely effects of the merger. During DOJ's original announcement rejecting the merger you stated, "High level executives at US Airways have talked about how consolidation allows for capacity reductions that "enable" fare increases.

In particular, DOJ's complaint provided evidence of past behavior by US airways to punish a rival for its reducing fares, it also alleged that the merger would reduce capacity and growth across the industry; and result in increased coordinated interaction among the remaining legacy airlines.

The Complaint specifically documented the troubling history of US Airways' communicating directly to a rival airline that it was upset by that airline's efforts to complete more aggressively. In 2010, senior executives at US Airways complained that competition from the rival airline was "hurting profitability" in the industry. DOJ wrote: "[S]enior management debated over email about how best to get the rival airline's attention and bring it back in line with the rest of industry …. [The CEO] urged the other executives to, 'portray these guys as idiots to Wall Street and anyone who'll listen.'"

The Justice Department also correctly predicted that this kind of behavior would continue should the merger be allowed to proceed – as it ultimately was. In the original complaint, DOJ wrote, "The structure of the airline industry is already conducive to coordinated behavior … the legacy airlines closely watch the pricing moves of their competitors. When one airline 'leads' a price increase, other airlines frequently respond by following with price increases of their own."

To bring home the point, the Complaint follows, "Coordination becomes easier as the number of major airlines dwindles and their business models converge."

I agree. I therefore urge the antitrust Division to conduct a full and thorough investigation of anticompetitive, anti-consumer conduct and misuse of market power in the airline industry, evidenced by recent pricing patterns as well as remarks made at the IATA conference. Consumers are paying sky-high fares and are trapped in an uncompetitive market with a history of collusive behavior. If you find that these comments were coordinated to punish southwest Airlines' announcement of capacity

> increases, I urge you to use all the tools at your disposal to punish this anti-competitive and anti-consumer behavior.

32. The DOJ acted promptly. On July 1, 2015, Associated Press reported that the DOJ had sent civil investigative demands ("CIDs") to a number of airlines on June 30, 2015. A spokesperson for DOJ, Emily Pierce, confirmed this report, saying the Department was investigating "possible unlawful coordination" to limit capacity increases, and thereby keeping ticket prices high. CBS News reported that Delta, American and UA confirmed receiving CIDs from DOJ. Southwest confirmed receiving one as well.

33. Also on July 1, 2015, George Jepsen, the Attorney General of the State of Connecticut, announced that his office is conducting a similar investigation into collusive activity among air carriers and had sent letters to Delta, UA, American and Southwest.

34. Blumenthal welcomed the DOJ's action, saying "[t]his investigation must be tireless and timely to save consumers from the onslaught of price increases in summer fares that may result from collusive and anticompetitive airline company misconduct." Schumer agreed, stating that "[i]t's hard to understand, with jet fuel prices dropping by 40 percent since last year, why ticket prices haven't followed…. We know when airlines merge, there's less price competition."

35. The business Travelers Coalition ("BTC") also applauded the initiation of this investigation. As reported in a July 2, 2105 article in *eTurbonews*:

> "The number one concern that antitrust experts have – with no close second – as with regard to radical consolidation of any industry, is the risk of tacit competitor coordination on policies, practices and prices among a reduced number of industry participants," stated BTC chairman Kevin Mitchell. "Since recent U.S. airline mega-mergers, we have witnessed near constant airline CEO calls for 'capacity discipline' during industry gatherings and analyst earnings calls only to be echoed by analysts in follow-on earning calls with other airlines. This represents perhaps the darkest hours of airline coordination as well as a too-cozy harmonization between airlines and Wall Street," added Mitchell.

36. The same article noted that the "tacit coordination on capacity" was accompanied by an "even more aggressive and widely coordinated attack on price transparency, consumer protections and competition." The BTC offered the following evidence of this coordinated attack by Defendants:

ANCILLARY FEE DATA
Since 2008, the Big Three U.S. airlines (Delta Air Lines, American Airlines, United Airlines) have rejected their most valued corporate customers' demands for ancillary fee data that would enable their business travelers to efficiently see, compare and buy ancillary services (*e.g.*, checked bags, preferred seats) in the same transaction as the base airfare. Leisure travelers must navigate airline websites in search of best airfare and ancillary fee combinations often paying higher prices than necessary. In total, this opacity results in these ancillary fees not being disciplined by market forces. Likewise, there is a great profit in consumer confusion.

PASSENGER FACILITY FEES
Airports use PFCs to add gates and other facilities to attract additional airlines to compete for local travelers' business expanding consumer choice and disciplining incumbent airlines' prices. The Big Three seem to not want new competition.
****

NORWEGIAN AIR INTERNATIONAL'S (NAI) APPLICATION
Under the EU-US Open Skies agreement, NAI's application to serve the U.S. should have been a 5-week pro forma review and approval. Instead, airlines' political pressure has held up approval for 5 months. This is as embarrassing to the United States as it is outrageous in its harm to U.S. consumers. Airlines fear that if NAI's low-fare business model were to be embraced by U.S. consumers, other carriers like Ryanair and JetBlue would seek to emulate NAI's success.

U.S. DOT CONSUMER PROTECTION AUTHORITY
The Big Three fought the Full Fare Advertising Rule promulgated in 2011 by DOT. When DOT implemented the rule to safeguard consumers' interests, the airlines sued DOT in federal district court and lost. They then went to the Supreme Court, which rejected their pleas. Airlines finally turned to the U.S. House of Representatives to pass the Orwellian named Transparent Airfares Act of 2014. The bill, luckily rejected by the Senate, would have increased airlines' revenues and profits by obscuring the true price of air travel options.

PROTECTION FROM GULF CARRIER COMPETITION
The Big Three claim that the Gulf airlines – Emirates, Qatar and Etihad – receive government support that is harming the U.S. carriers. The Big Three co-opted Congress again with a Congressional letter that supports the Big Three's call for a freeze in new air services by the Gulf airlines – all without having allowed those carriers an opportunity to respond to the allegations, not to mention the glaring hypocrisy that the U.S. airline industry, by the Big Three's very own math, has been the most heavily taxpayer subsidized and structurally advantaged in the history of commercial aviation. Brazenly, the airlines recently warned the Obama Administration that if they don't play ball, the Big Three will again seek Congressional legislative support.

37. The BTC is not alone in its concerns about Defendants' efforts to curb fare transparency to customers as a facilitating device to keep domestic air passenger fares high. On May 19, 2015, the

Travel Technology Association issued a report prepared by Charles River Associates and authored by the aforementioned Dr. Fiona Scott Morton entitled "Benefits of Preserving Consumers' Ability to Compare Airline Fares." The report noted that competition had suffered because of domestic passenger airline mergers and efforts by the major airlines to lead travelers away from online travel agencies ("OTAs") that facilitate price comparisons of fares and other anticompetitive aspects of the recent consolidation in the domestic air passenger services industry. Its major findings were:

- Restrictions by airlines of broad access to airline information – prices and schedules – substantially reduce consumer welfare. This study estimates the potential reduction in net consumer welfare of limiting airline price and schedule information to only airline websites could exceed $6 billion per year. Additionally, such restrictions may result in up to 41 million passengers annually choosing not to fly.
- In addition to offering independent price comparisons, OTAs and metasearch travel sites provide consumers with other travel information, such as suggestions for places to go and things to do. Supplementing airline schedule information with complementary information and products expands the market for air travel, further increasing consumer welfare.
- Airline markets are highly concentrated, with significant barriers to entry. The recent merger of American Airlines and US airways has led to fare increases in affected city-pair markets that are about 4 percent higher than in non-affected markets. In certain city-pair markets in which the merger reduced the number of significant competitors from 3 to 2, or from 2 to 1, fare increases have been 7 to 17 percent. The welfare-enhancing impacts of broad access to airline fare and schedule information may be even larger in duopoly or monopoly city pairs.
- Airline profits globally are at an all-time high, expected to reach $25 billion for 2015. While airline fuel prices declined nearly 25 percent last year, average domestic airfares have remained flat while ancillary revenue of the major U.S. airlines grew to over $15 billion in 2014.

38. The report went on to note that the airlines have engaged in coordinated efforts to stifle online metasearch airfare websites. These efforts included the following conduct:

- Prohibiting metasearch sites from referring consumers to an OTA for booking a flight.

● Prohibiting OTAs from providing airline information to metasearch sites.

● Prohibiting GDSs from providing airline price and schedule information to "unauthorized" metasearch sites.

● Prohibiting onward-distributing flight schedule information to metasearch sites by services such as Innovata.

● Refusing to pay metasearch sites for direct referrals to the airline's own booking website.

● Prohibiting metasearch sites from displaying price information of the airline.

The report offered specific examples of such conduct undertaken by Delta, American, and UA. The report estimated that in the absence of transparent information about airfares, the airlines earn approximately an extra $30 on each leisure and unmanaged business passenger.

39. In response to the airlines' assertions that they price airfares on demand, Dr. Fiona Scott Morton said in the aforementioned *New York Times* article that "'on most airline routes, consumers have very little choice.' She noted that only since the recent wave of consolidation among airlines have they been able to set prices significantly above marginal cost. 'That's great for the industry but not for consumers,' she said."

**X. CLASS ACTION ALLEGATIONS.**

40. Plaintiffs bring this action on her own behalf and as a class action pursuant to Rule 23(a) and (b) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Class'):

> All persons and entities that purchased air passenger transportation services for flights within the United States directly from Defendants or any predecessor, subsidiary or affiliate thereof, at any time between July 2, 2011 and the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and their immediate families. Also excluded from the class are any judicial officers, their court staffs, as well as jury members and the immediate families of all such individuals.

41. Plaintiffs does not know the exact number of members of the Class because such information is in the exclusive control of Defendant. Due to the nature of the trade and commerce involved, however, Plaintiffs believe that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all

Class members is impracticable.

42. There are questions of law and fact which are common to the claims of Plaintiffs and the Class, including, but not limited:

a. Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for fares charged for air passenger transportation services;

b. Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for air passenger transportation services;

c. The existence and duration of the horizontal agreements alleged herein to fix, maintain, and/or stabilize the prices for air passenger transportation services;

d. Whether Defendants violated Section 1 and Section 3 of the Sherman Act, 15 U.S.C. § 1, 15 U.S.C. § 3;

e. Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

f. Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and members of the Class, and, if so, the appropriate measure of damages; and

g. Whether Plaintiffs and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Section 1 and Section 3 of the Sherman Act.

43. Plaintiffs' claims are typical of the claims of the members of the Class.

44. Plaintiffs will fairly and adequately assert and protect the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.

45. Plaintiffs are represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

46. The questions of law and fact common to the members of the Class predominate over any

questions affecting only individual members.

47. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b. The Class is readily definable and one for which records should exist in the files of Defendants.

c. Prosecution as a class action will eliminate the possibility of repetitious litigation.

d. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e. Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

48. This class action presents no difficulties of management that would preclude its maintenance as a class action.

**COUNT I**

**Violation of Section 1 and Section 3 of the Sherman Act, 15 U.S.C. § 1, 15 U.S.C. § 3**

49. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

50. Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of air passenger transportation services for flights within the United States in violation of Section 1 and Section 3 of the Sherman Act, 15 U.S.C. § 1, 15 U.S.C. § 3.

51. Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of air passenger transportation services.

52. In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize prices for air passenger transportation services.

53. The illegal combination and conspiracy alleged herein had the following effects, among others:

a. The prices charged by Defendants to, and paid by, Plaintiffs and members of the Class for passenger fares were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b. Plaintiffs and members of the Class have been deprived of free and open competition in the purchase of air passenger transportation services;

c. Plaintiffs and members of the Class have been required to pay more for air passenger transportation services than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy; and

d. Competition in the sale of passenger air transportation has been restrained, suppressed or eliminated.

54. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

**XI. PRAYER FOR RELIEF.**

WHEREFORE, Plaintiffs pray:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure be given to the members of the Class;

B. That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 and Section 3 of the Sherman Act;

C. That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiffs and the Class;

D. That the Court award Plaintiffs and the Class treble damages;

E. That the Court award Plaintiffs and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

F. That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintain or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

G. That the Court award Plaintiffs and the Class such and other further relief as may be deemed necessary and appropriate, including divestiture of certain acquired assets by prior mergers to assure that air passenger transportation services are once again competitive.

**XII. JURY TRIAL DEMAND.**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: September 9, 2015.

*Jeffery K. Perkins*

JEFFERY KENNETH PERKINS
Attorney for Plaintiffs